**HUMMEL & DOWNING CO. v. HINDE & DAUCH PAPER CO. et al.**

**SAME v. KIECKHEFER BOX CO.**

(Circuit Court of Appeals, Seventh Circuit. March 3, 1921.)

Nos. 2762, 2763.

1. Patents ☞328—Reissue 14,267, for package sealing machine, held invalid as unauthorized.

The Morton reissue patent, No. 14,267 (original No. 1,138,238), for improvements in package sealing machines *held* invalid as not authorized by any inadvertence, accident, or mistake in the original patent, and also as containing new matter.

2. Patents ☞328—1,216,175, for improvements in presses, held void for anticipation.

The Simpson patent, No. 1,216,175, for press for package sealing machine, *held* void for anticipation and lack of invention.

3. Patents ☞328—1,228,978, for platen connections, held void for lack of invention.

The Simpson patent, No. 1,228,978, for improvements in platen connections in package sealing machines, *held* void for anticipation and lack of invention.

Appeals from the District Court of the United States for the Eastern District of Wisconsin.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suits in Equity by the Hinde & Dauch Paper Company and another and by the Kieckhefer Box Company against the Hummel & Downing Company. Decrees for complainants, and defendant appeals. Reversed.

Arthur L. Morsell, of Milwaukee, Wis., for appellant.

Max W. Zabel, of Chicago, for appellees.

Before BAKER, ALSCHULER, and PAGE, Circuit Judges.

PAGE, Circuit Judge. *No. 2762.* On November 10, 1913, one Lawrence D. Morton filed his application for patent upon improvements in package sealing machines. There was issued to said appellee, The Hinde & Dauch Paper Company, assignee, on May 4, 1915, letters patent No. 1,138,238, hereinafter known as the Morton original. On August 5, 1916, Morton petitioned for a reissue of letters patent, and reissue letters No. 14,267 were, on March 6, 1917, issued to the Hinde & Dauch Paper Company. The Hinde & Dauch Paper Company constituted its coappellee, Kieckhefer Box Company, licensee under said reissue letters patent.

*No. 2763.* The complaint alleged that on June 29, 1914, one Simpson filed application for improvements in presses; that letters patent No. 1,216,175, bearing date February 13, 1917, were issued thereon to appellee, as assignee; that on the 28th of October, 1914, said Simpson applied for patent for improvements in platen connections; that there was, on June 5, 1917, issued to the appellee, as assignee, letters patent No. 1,228,978; that the appellant had infringed.

The cases were tried together and resulted in a decree for appellees (plaintiffs) in 2762, finding infringement of claims 9, 10, 11, 12, and 13 of the Morton reissue patent, and, in 2763, a decree in favor of appellee (plaintiff) found infringement of claims 2 and 3 of the Simpson patent, No. 1,216,175, and claims 1, 2, and 3 of Simpson patent, No. 1,228,978. These are appeals brought to reverse those decrees.

## No. 2762.

[1] No history of the Morton invention appears in the record, other than that shown in the file wrappers. The Morton original patent was allowed November 23, 1914, and letters issued May 4, 1915. Each of the 10 claims allowed was for a combination embracing a revoluble carrier. The file wrapper shows that the claims filed with the original application covered some of the constituent elements of the individual sealing device, shown in the drawings. It also shows that from time to time other such elements were introduced into the claims. Morton's specifications, with 28 claims, for the reissue, were supported by an oath. Concerning that oath, the department said:

"The oath accompanying this application is insufficient, because it fails to set out the alleged defects and insufficiencies with the particularity required by rule 87. * * * The oath alleges that specification does not set forth the general mode of operation with sufficient clarity and that the claims are not sufficiently broad. *Even these general statements do not appear to be borne out by a comparison of the original and reissue applications.*"

A new oath was made by Morton. The differences in the wording of the two oaths are shown in the following parallel:

| Original. | Amended. |
|---|---|
| 1. The claims are unnecessarily limited to a revoluble framework. | 1. Each claim, respectively, the claims numbered from 1 to 10, inclusive, has in line 1 thereof either the word 'revoluble' or the word 'revolving,' thus limiting the device to a framework which is rotatable, whereas the rotatable feature of the device is merely incidental. |
| 2. The specification does not set forth with sufficient clarity the general mode of operation of the device. | 2. That such errors so particularly specified occurred as follows: The attorney in charge of the prosecution failed to realize during the prosecution that the revolving character of the framework was merely incidental and thus included that unimportant feature as one of the controlling elements in the claims. |
| 3. That such errors so particularly specified occurred as follows: Through the failure of the attorney to have the claims of sufficient breadth on account of a mistake in his understanding of the real mode of operation of the device. | |

We are unable to see any difference, in substance, between the two oaths. Morton was asked on the trial:

"Q. The oath forming part of your reissue patent sets forth that through inadvertence, accident, or mistake the claims of the original patent were not made broad enough to cover your invention. Can you tell us what that inadvertence, accident or mistake was?"

He answered:

"That is the language of an attorney, and I would rather not get into it."

An examination of the claims presented, and of those rejected and those allowed, and of the changes made in the specifications filed for the reissue, convinces us that no inadvertence, accident, or mistake intervened in the prosecution of the original Morton application.

The elements composing the combination in claim 9 are as follows: (1) A pair of platens; (2) means for bringing said platens into and out of parallel aligned relation; (3) lever and cam mechanism for moving one of said platens relatively to the other when in their aligned condition; (4) a stem upon which one of said platens is mounted, said last aforesaid platen consisting of a rigid platelike structure and having edges parallel substantially to the sides of a box structure, so that the loose box end extremities may be folded upon said platen into their overlapping positions; (5) a support upon said stem adapted to hold the lower extending unfolded extremities of said box.

Claim 10 is identical with claim 9, except there is added: (6) A yielding mounting for one of said platens.

Claim 13 is the same as claim 9, except it is not so specific in some respects.

Claim 11 is for (1) a pair of platens; (2) means for bringing said platens into and out of parallel aligned relation; (3) an adjustable stop to control said means; (4) means for moving one of said platens relatively to the other when in their aligned condition; (5) a stem upon which one of said platens is mounted; and (6) a yielding mounting for one of said platens.

The elements of claim 12 are: (1) A pair of relatively moving platens; (2) a supporting structure therefor whereby relative motion may be imparted to the platens so that a box structure may be placed upon one of said platens without interference from the other platen; (3) means for moving and locking one of said platens whereby said platens are adapted to seal the overlapping ends of a box structure placed therebetween by pressing the overlapping ends between them, and means whereby opposing box flaps may be pressed toward each other prior to sealing.

In claim 9 there is no element that is not very old and that has not been used in combination many times, unless it is the fifth element: "A support upon said stem adapted to hold the lower extending unfolded extremities of said box." The record shows that this element was put upon the modified Muscatine machine some time in 1913. While it is not clearly shown that that was prior to November 10, 1913, when Morton filed his original application, yet it does clearly appear that this element was embraced and used in the modified Muscatine machine six months before it was embodied in any claim by Morton. It further appears that the Morton invention was a package sealing machine, whereas the support in question really had nothing to do with the sealing operation performed by the machine. It was merely a stop placed at such a distance below the upper surface of the lower platen as would bring the hinge line between the upper flaps and the sides of the box into the plane of the upper face of the lower platen. The sole purpose of it was to facilitate, not an operation of the machine, but a hand operation of turning down the flaps on the head of the lower platen. There is nothing in the record, except the argument, to show that this really added anything even to the hand operation. From the reading of the record it is more than doubtful whether it did or could facilitate such an operation.

We have seen that this machine was particularly designed for use in connection with heavy grades of boxes, made of heavy cardboard, corrugated paper, and the like. The specifications repeatedly use the word "flaps" to distinguish the ends that are turned down. It also appears that the support is so spaced below the face of the lower platen that the "hinge line" is brought to a certain point. It also appears that unskilled labor is used to do the work of sealing. From the nature of heavy cardboard, particularly of corrugated paper and the like, and from the use of the word "flaps" and the words "hinge line," it is altogether probable that the hinge line referred to was a real hinge made by scoring; if so, then that fixed definitely the point, and the only point,

at which the flap could be turned down. It seems obvious that heavy cardboard and corrugated paper could not be otherwise handled without much breakage, and that unskilled labor could not handle such material at all, unless it was scored to make hinges for the flaps; particularly would that be true if the width of the box was so great that the operator could not, in pressing the flap down, cover its whole width with one or both of his hands. If the support added anything to any operation, it added to the hand operation and represented a mere aggregation and not invention. It was never more than a mere rest or stop. The same supports are found in the Wyman patent, No. 731,729, in what seems to us to be substantially the same combination, and likewise in the Jewell patent, No. 600,348, and Weis patents, Nos. 1,095,536 and 1,-095,537.

The above discussion fully disposes of claim 10, except as to the provision, "a yielding mounting for one of the platens." This element was clearly present and represented in the spring *17*, interposed between the platen and the arms *12*ª in Figure 5, Weis patent, No. 1,095,536. It was also clearly present and represented in the coil springs in the Muscatine machine, as shown in the opinion in case No. 2763.

The discussion of claim 9 fully disposes of claim 13.

Claim 11 contains an element, "an adjustable stop to control said means" of bringing the platens into and out of parallel aligned relation. Reading together two widely separated statements found in appellees' brief, we find that, in reading claim 11 upon the appellant's device shown in drawing A22, it is said that the adjustable stops in Claim 11 are the stops *3* and *4* in drawing A22; but elsewhere in discussing claim 11 appellee claims counsel says that the adjustable stops therein are the elements *O*. The so-called adjustable stops *3* and *4* in A22 are set screws found at the bottom of the stem or shaft carrying the lower platen, and the elements *O* are the springs shown on the head *H* (Morton drawing) of which it is said in the old specifications:

"During this operation the guides *O* insure proper registration of the heads *G* and *H*, so that, when clamped, all portions of the overlapping flaps are firmly pressed together."

To which was added in the reissue specifications:

"Thus the guides *O* as stated press the overlapping flaps toward each other prior to and up to the time that the platens begin their operation of pressing the overlapping faces together."

We are unable to see in the guides *O* anything that could possibly control the means for bringing said platens into and out of parallel aligned relation. There are stops *F* and *F'* shown at the bottom of the stem in the Morton drawing, which more nearly approach the adjustable screws *3* and *4* in appellant's A22, but they are nonadjustable and there could be no infringement of this element.

Claim 12 contains the element, "means whereby opposing box flaps may be pressed toward each other prior to sealing." Here, again, ap-

pellee's separated arguments must be brought together. In one place appellee says that the elements $O$ represent means whereby opposing box flaps may be pressed toward each other prior to sealing. These are the same elements $O$ referred to in discussing claim 11. In reading claim 12 upon appellant's structure, it is said that means whereby opposing box flaps may be pressed toward each other prior to sealing find their equivalent stop *13* (appellant's A22) or the downwardly extending lugs forming a part of the platen in appellant's B23.

Analyzation of the specifications on the method of operation, etc., shows that the arguments and conclusions are unsound. First, the elements $O$ could not at one and the same time find their counterpart in stop *13* (A22) or the downwardly extending lugs in B23, and also in the set screws at the bottom of the stem or standard in A22. It is possible that stop *13* (A22), which is adjustably fastened onto the framework and which is designed to come in contact with the box over the outer edge of the lower platen at one point, may be a stop against which, in a hand operation, the box could be pressed by the operator, so as to bring the flaps together. In such case it is a mere stop, and it does not constitute a machine operation by means of which opposing box flaps are pressed together. The same is true of the downwardly extending lugs in B23. But a difficulty quite as serious arises in connection with the guides $O$, which in the original specification were merely to insure proper registration of the upper and lower platen. As above shown, the words, "Thus the guides $O$ as stated press the overlapping flaps toward each other prior to and up to the time that the platens begin their operation of pressing the overlapping faces together," present a false conclusion. It is wholly new matter in the reissue specifications, and not permissible.

There is a further reason why the argument and conclusions are unsound. There is a clear intimation that the lower platen is the exact size of the interior of the box to be sealed. This is asserted in the argument in case No. 2763. In fact, it would seem to be necessary in order that the package head may be sealed throughout. From the nature of the operation in the use of heavy cardboard and corrugated paper boxes, it would be absolutely necessary that there should be scored a hinge line between the flap and the body of the box, or that the lower platen should be of the exact size of the box. If the hinge line was scored the flaps would fall or be easily pressed down, bending naturally at the score line, and the flaps would fall in such a relation to each other as the size permitted or required. The platen would square the box perfectly, with the edge of the platen touching the inside of the box all around, so that there would be neither opportunity nor necessity for any means of squaring the box or pressing the edges of the flaps together. They would be together or apart, just as they were cut. On the other hand, if the platen was not the exact size of the inside of the box, it could only be smaller, and unscored heavy cardboard or corrugated paper could not be bent down over a platen smaller than the box by an unskilled laborer or any one else. If means are used to

press opposing box flaps toward each other prior to sealing, that means is the unpatented and unpatentable hands of men and no part of the appellee's device.

## No. 2763.

This suit, heard together with 2762, was brought by appellee, Kieckhefer Box Company, upon patent No. 1,216,175, for which application was filed June 29, 1914, and upon patent No. 1,228,978, application filed October 28, 1914, and is here to reverse the decree of the District Court, finding infringement and sustaining validity of claims 2 and 3 of the first patent and all three claims of the other.

## Simpson Patent No. 1,216,175.

[2] Appellee claims in argument that "the novel feature of this patent rests in the means provided for securing the complete closure of the box ends." The thing claimed in the specifications is:

"Downwardly extending lugs are provided at the rear and at one end of the plunger to assist in squaring the box flaps, * * * these lugs having a sufficient length to reach below the plane of the said flaps, when the plunger is in its upper position. Before lowering the plunger the operator presses the box flaps toward the center of the press, and while holding them in this position the lever is thrown."

The language in claims 2 and 3 is:

"Downwardly extending lugs along one edge of the plunger against which the box flaps may be forced before lowering the plunger."

Another clause of the specifications is important, viz.: "The platen is of a size to just fit within the box." Appellee gives the operation of the press as follows:

"When the stem is swung outwardly * * * the blank box form may be inserted over the platen until the lower box extremities rest upon the arms. The operator then folds two of the flaps inwardly, applies adhesive thereon, and folds the two outer flaps on top. The structure is then swung inwardly to the position * * * directly underneath the platen, so that the inner end of the box form rests against the downwardly extending lugs. * * * During the time that the operator is pulling down the lever so as to force the platen into sealing position the operator exerts by hand a pressure against the upper forward edge of the box form so as to push the box form tightly against the lugs. In this manner the upper opposing box flaps are pressed toward each other prior to sealing in order to thereby get the requisite closure of the box end."

In the Morton specifications, as amended for reissue, it is stated:

"My improved machine is particularly designed for use in connection with the heavier grades of knock-down boxes made of heavy cardboard, corrugated paper, and the like. * * * The package or carton which is closed and sealed upon my improved machine comprises rectangular sides hinged to each other at the corners and projecting flaps from opposite ends thereof. In knock-down position the sides and end flaps lie in the same plane."

Taking these matters as claimed, they show:

1. That the means "to assist in squaring the box flaps" as set out in the specifications, viz. "lugs at the rear and at one end of the plunger," were abandoned in the claims in question, and the operation of "press-

ing the box flaps toward the center of the press and * * * holding them in this position" was also abandoned in the claims in question.

2. In the specifications the lugs only assisted in squaring the flaps. So far as appears from the specifications, the pressing of the box flaps toward the center and holding them there was done by the operator, wholly unaided by the lugs. In the claims in question a different means, viz. lugs along one edge was claimed and a different purpose claimed, viz. "against which the box flaps may be pressed."

3. If the lower platen is made as specified, viz. "of a size just to fit within the box," then neither the function of the lugs specified, viz. "to assist in squaring the box flaps," nor the function claimed, viz. "against which the box flaps may be forced," could by any possibility be performed because a "platen just to fit" would square the box and the flaps would fall together just as they were cut.

4. Including the lugs as an element in a combination, and not claiming them singly, is an admission that they are not new. In the combination as claimed they could not be useful. The claims are for something not specified.

5. In appellee's operation of the press, as described, the flaps are not pressed against the lugs, nor is there contact anywhere.

Every element in the claims is found in the Morton device, even down to the lugs. The only attempt to point out any difference in this respect between the lugs and the fingers O in the Morton patent is in the following:

"These means are different in manner of detail from those disclosed in the Morton patent."

The contention is made that the lug or stop in appellant's device is the equivalent not only of the Morton fingers, but also of the Kieckhefer lugs. That being true, the Morton fingers and the Kieckhefer lugs must be the equivalent of each other, with the Morton as prior art.

The cartons described in the Morton patent and also in the Kieckhefer patent have identical ends (only one can be sealed on the press). From the uncertainty and lack of harmony between the specifications and the claims in question, when considered in connection with the following language from the Morton specifications, viz. "Thereafter, the boxes are filled with merchandise and the sealing of the second end presents no particular difficulties" it is doubtful what, if any, purpose either the fingers or the lugs perform.

## Simpson Patent No. 1,228,978.

[3] The claim under this patent is that the universal mounting of one of the platens, it does not matter which, is novel and important. The universal mounting has been so long and so variously in use that its use may almost be said to be universal. The press described by Simpson is no more truly a press than is the Lockwood copying press, patent No. 438,850, of October 21, 1890, where the universal mounting was used. The plate on the end of the ordinary builder's screw jack is a very old example of the universal mounting and designed to not only

permit the turning of the screw, but the adjustment of the plate to any angularities or irregularities in the contact.

The universal mounting, or perhaps, to be more accurate, the substantial equivalent thereof, was long used in the Muscatine machine. Its use by Simpson added nothing to the art. The Muscatine machine is disposed of by appellee in a very brief argument, which in substance says:

"The machine, according to appellant's testimony, was built in 1901 and used continuously until 1910. The machines then remained idle for three years, until some of them were purchased by Mr. Ziegler, * * * being what might be called an abandoned device."

This argument is not supported by the record. That the Muscatine machine never became commercially known might well be due to the fact that it was made by a user of cartons, not by a maker and vendor of them. The Muscatine machine was made by a man doing general carpenter work in an oatmeal mill in Muscatine, Iowa, in 1901. It was never patented, but was used continuously for 10 years. Then, because of changes in the business, its use was temporarily discontinued. Some time in 1913 it was put into use again, and because it then had added to it rests or arms, upon which the box rested while the upper end was being sealed, was called in the record the "modified Muscatine machine." It is in fact insisted that the last modification was made so recently that it was later than the Morton original application, and therefore does not represent prior art. There is nothing here that indicates abandonment. The record shows continued use and improvement.

The fact that the machine is crude so far as workmanship is concerned can make no difference. It had every element found in the Morton and Kieckhefer machines, excepting only the rotatable feature of the Morton, and possibly the lugs, and did the same work. The record shows that the stem of the Muscatine machine was merely a continuation of the lower platen of that machine, and that it was just the size of the containers that were placed over it, so that those downwardly extending sides of the stem were downwardly extending lugs, and, being the size of the carton, necessarily squared it.

The Muscatine machine antedated the Simpson patents, and the fact that it was made up from old and well-known elements by a man doing general carpenter work in the Muscatine mill is convincing evidence that the Simpson patents are merely aggregations of old elements, in which no element performs any new function. Neither does the combination.

Both decrees are reversed, and the causes remanded, with instructions to dismiss the bills.